IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 29, 2020 Session

**UNJOLEE MOORE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County**
**No. 301490   Don W. Poole, Judge**

———————————————————

**No. E2019-01076-CCA-R3-PC**

———————————————————

The Petitioner, Unjolee Moore, filed a petition for post-conviction relief in the Hamilton County Criminal Court, claiming that he received the ineffective assistance of counsel. After an evidentiary hearing, the post-conviction court filed an order denying relief, and the Petitioner filed a "motion to reconsider." The post-conviction court granted the motion, vacated its order denying relief, and reopened the proof. Subsequently, the post-conviction court filed a second order denying relief. On appeal, the Petitioner maintains that he received the ineffective assistance of counsel. The State argues that this appeal should be dismissed because the Petitioner's notice of appeal was untimely. The State also argues that the timely filing requirement should not be waived and that even if this court waives timely filing, this court should disregard the evidence presented at the second evidentiary hearing because it is not part of the record. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the Petitioner's notice of appeal was not untimely and that the evidence from the second evidentiary hearing is properly before us. However, we also conclude that the post-conviction court correctly denied the petition for post-conviction relief. Accordingly, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Daniel J. Murphy, Lewisburg, Tennessee, for the appellant, Unjolee Moore.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; M. Neal Pinkston, District Attorney General; and Cameron B. Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# I. Factual Background

In April 2011, the Hamilton County Grand Jury indicted Steven James Ballou, Harold Francis Butler, John Thomas Simpson, and the Appellant for the first degree felony murder of Bernard Hughes (hereinafter "the victim"), the attempted especially aggravated robbery of the victim, the attempted first degree premeditated murder of Tim Westfield, and employing a firearm during the commission of or the attempt to commit a dangerous felony. The Petitioner was tried separately from his codefendants, and the jury convicted him as charged in the indictment of first degree felony murder; attempted especially aggravated robbery, a Class B felony; and employing a firearm during the commission of or the attempt to commit a dangerous felony, a Class C felony. The jury convicted him of attempted second degree murder, a Class B felony, as a lesser-included offense of attempted first degree premeditated murder.[1] The trial court sentenced the Petitioner to life for first degree felony murder. After a sentencing hearing, the trial court sentenced him to fifteen years for attempted especially aggravated robbery and attempted second degree murder and six years for the weapons offense. The trial court ordered that the Petitioner serve the six-year sentence for employing a firearm consecutive to the fifteen-year sentence for attempted second degree murder but ordered that the Appellant serve the other sentences concurrently for a total effective sentence of life in confinement.

On direct appeal of the Petitioner's convictions, this court recounted as follows:

> The defense moved, prior to trial, to suppress the [Petitioner's] statement to police, arguing that he had been denied his right to counsel and that he had not signed a rights waiver. The [Petitioner] also asserted that he was entitled to relief based on law enforcement's failure to record the entire interview in which he gave his statement. The transcript of the hearing on this motion is not part of the record before us. In its written order, the trial court summarized the testimony at the suppression hearing by noting that Investigator Michael Wenger had testified that the [Petitioner] was advised of his rights and never requested a lawyer. Investigator Wenger noted that the interview was recorded in two separate audio files because the batteries on his recording device failed during the interview. When Investigator Wenger left the room to change the battery, two agents in the Alcohol, Tobacco, and Firearms division continued to speak to the [Petitioner], and this portion of the interview was summarized in their report. At some point after the batteries were replaced, the memory on the device became full, and it could no longer record. Investigator Wenger had experienced problems

---

[1] The grand jury also had indicted the defendants for the first degree premeditated murder of the victim. However, at the outset of the Petitioner's trial, the State advised the trial court that it was not going to proceed on that charge.

- 2 -

with the device on three or four prior occasions. According to the trial court's order, the [Petitioner] testified that he did not sign the rights waiver and that he had asked for a lawyer several times. The trial court denied the motion to suppress the statement or to dismiss the indictment for failure to preserve the entire statement, but the court stated it would give an instruction to the jury regarding the break in the recording.

. . . .

At trial, Myra Collier testified that she had known the victim for sixteen years and that he was her best friend. Ms. Collier had been in a relationship with one of the co-defendants, Mr. Ballou, and he and the [Petitioner] were acquainted with the victim because they had come to the victim's house a few months prior to the homicide to see Ms. Collier. The victim sold marijuana from his house.

On June 28, 2010, Ms. Collier and Cindy Cross spent the afternoon at the victim's apartment. After dinner, Timothy Westfield came to see the victim. Ms. Collier testified that they had obtained liquor prior to Mr. Westfield's arrival but that she did not think they had consumed much alcohol. She acknowledged that, according to a crime scene photograph, the bottle of gin they had been consuming contained only about one-half of one inch of liquid.

Ms. Collier testified at trial, although Ms. Cross did not. Ms. Collier testified that she did not hear the knock when the assailants came to the door because she was in the bathroom. When she emerged, Ms. Cross told Ms. Collier that she thought the victim was being robbed, and Ms. Cross said she heard gunshots. The two women ran upstairs. Ms. Collier did not recall Mr. Westfield telling her to go upstairs. She looked out of a window and did not see anything, and she did not hear gunshots herself. The two were upstairs only briefly. When they came down, they unlocked the door and saw the victim lying on the porch, bleeding. Ms. Collier stated she checked the victim's pulse and that he was not breathing. She acknowledged that she did not try to perform CPR despite her prior nursing experience. Ms. Collier testified that she ran to get a police officer who lived at the apartment complex. She did not recall calling 911. She acknowledged having called her uncle, Captain Edwin McPherson, but stated the telephone call occurred prior to the robbery.

On cross-examination, Ms. Collier did not recall telling the police that she did not know the [Petitioner] at all, and she stated that she knew his face but did not know his name. She acknowledged having gone on a trip with her cousin Ariel on Memorial Day weekend, but she could not recall if she spoke with the [Petitioner] by telephone on that trip. She did not know the location of the telephone to which the [Petitioner] may have placed the Memorial Day weekend call. Ms. Collier did not recall telling police that she did not introduce the [Petitioner] and the victim, although she testified, "but I guess I probably didn't." She denied having anything to do with the robbery or murder of the victim.

Mr. Westfield, who had known the victim since they were children, testified that he came to the victim's house on June 28, 2010, between 10:30 and 11:00 p.m. to socialize and to help the victim with a computer. When he arrived, two of the victim's friends, Ms. Cross and Ms. Collier, were sitting outside, and the victim was on his way home. The four went inside when the victim arrived, and Ms. Collier's cousin stopped by to borrow some DVDs and then left. The four had been inside at least twenty minutes, and the victim seemed "on edge," when they heard a knock. Mr. Westfield testified that Ms. Collier was not in the bathroom at the time of the knock. Ms. Collier, however, had testified that she was in the bathroom. According to Mr. Westfield, the victim looked out of the peephole, then turned to Mr. Westfield and gave him "a peculiar look." The victim opened the door, went out immediately, and closed the door behind him.

While the door was open, Mr. Westfield saw a shorter man and a taller man standing outside. Mr. Westfield identified the taller man as John Simpson. The shorter man was wearing a "do-rag" or half-mask over his face with two colors, black and teal, and he had a gun. The shorter man was about five feet, four inches tall, had a tall bridge on his nose, and light eyes. Mr. Westfield acknowledged that he did not recognize the man at the time, but he stated that "as soon as I found out who it was, I knew it went two and two together." At trial he identified the shorter man as Harold Butler, whom he described as unique in appearance. Mr. Westfield testified that Mr. Butler's stature was consistent with wearing a size eight shoe. While the victim was passing out of the door, Mr. Westfield could see that the shorter man had a gun, and he heard the shorter man say, "Lay it down," which was a demand for the victim's possessions.

Mr. Westfield testified that he told the two women to go upstairs and that he went outside to assist the victim. Mr. Westfield testified at first that

he opened the door, saw the men scuffling, then shut the door, at which point it jammed. He later stated that the door was jammed when he first tried to open it. One of the women told him that it was only locked, and he opened it and went outside.

Outside, both of the men were hitting the victim on top of the head, and the victim was fighting back. Mr. Westfield leaped at the taller man. He heard three shots and saw two flashes in his eyes, and then everything went black. Mr. Westfield regained consciousness in a bush and saw the victim lying on the porch. He did not see blood at first and attempted to administer cardiopulmonary resuscitation ("CPR"), but "when I blew in his mouth and squeezed his nose, my finger went through his nostril where the bullet went in at and that's how I found the bullet wound, and when I bl[ew] in it, the matter came out of the back of his head." Mr. Westfield observed the shorter man hiding behind the fender of a nearby car, and the man got in a late-model silver car with dark windows. Mr. Westfield saw a shoe and baseball cap at the scene. He discovered that he had a gunshot laceration on his forearm and that the tip of one finger had been essentially severed by a bullet. Mr. Westfield acknowledged that he had told police the shorter man said something like "break yourself" instead of "lay it down," but he testified that the two phrases had the same meaning. He told police that the car was either a Maxima or an Altima. He did not recall saying that the car was gold and not silver, but he did not deny it, explaining that he was "going crazy" at the emergency room. He acknowledged that he only saw two men and that neither of the assailants was the [Petitioner].

Mr. Westfield stated he did not know if the victim had received complaints that too many people were coming to his house, and he stated that the victim had told him that the victim no longer sold marijuana. He did not recall telling law enforcement at the hospital that the victim had been getting complaints because he had too many visitors. Mr. Westfield acknowledged that the victim and his guests had been drinking alcohol on the evening of the homicide.

Investigator Michael Wenger testified that he was assigned to investigate the case. He interviewed witnesses and visited the scene. Investigator Wenger was looking for the [Petitioner] and found him in a parked 1999 gold or silver Nissan Maxima on July 9, 2010. The owner of the vehicle and the [Petitioner's] girlfriend, Michelle Angel, was in the passenger seat. Investigator Wenger testified that he gave the [Petitioner] Miranda warnings and that the [Petitioner] signed a rights waiver prior the

interview. He acknowledged having failed to sign as a witness on the waiver and stated that he was not aware that the [Petitioner] had been in special education or could not read until the eleventh grade. Officer Phillip Narramore and a federal agent were also assisting with the interview. Investigator Wenger testified regarding the failed battery and the memory problem with the recording device. He stated that he left the interview room to download the contents of the recording device, and when he returned "we had gotten most of what we needed, so I didn't continue with the interview." The interview began on July 9th and ended on July 10th. The [Petitioner] was permitted to take breaks and given dinner. The interview lasted four to six hours, but the [Petitioner] was at the station for ten to twelve hours.

In the recorded interview, the [Petitioner] acknowledged his involvement in the crimes. The [Petitioner] stated that "Ariel" had told him that the victim sold marijuana. The [Petitioner] knew the victim by sight through Ariel but did not know the victim's name. According to the [Petitioner], he and Mr. Butler had spoken about robbing a "dope boy," and they targeted a drug dealer because "[t]o be honest with you those was the easiest ones to get in the street . . . uh . . . cause like a dope boy won't call police." The [Petitioner] said that he and Mr. Butler spoke of the robbery at Mr. Butler's house approximately a week before the crimes, and at that time, he told Mr. Butler, "I could use some money too. I told 'em about maybe Bernard." The [Petitioner] told Mr. Butler that the victim did not keep a gun. At first, the [Petitioner] stated that he and Mr. Butler were alone during the conversation, but he later told police that Mr. Simpson was there as well. The [Petitioner] told police that Mr. Butler had a .38 revolver, a Hi-Point .45 caliber firearm, and a pump shotgun at his house.

The [Petitioner] also acknowledged that he anticipated sharing in the profits of the robbery. He stated that he "let [Mr. Butler] do it all" and just wanted to "collect a cut on the side." The [Petitioner] stated that "[t]hey promised to break me off . . . a little of what I get," and he stated he would gain "[a] cut out of it." More specifically, the [Petitioner] expected to get approximately $3,000 if $10,000 were taken, which he stated was forty percent. The [Petitioner] would get this money because he "turned him onto it." At first, the [Petitioner] acknowledged only taking the assailants to the apartment earlier in the day, and he denied being on the scene during the homicide. According to the [Petitioner], on the day of the homicide, he took Mr. Butler and another man to the victim's house, where several people standing outside saw them. The [Petitioner] told the people that he was not

- 6 -

hard to find and drove off. The [Petitioner] told police that during the homicide, Mr. Butler was driving a gold Maxima, "[s]ame kind as my girl's."

After police told the [Petitioner] that they had evidence putting him at the scene, the [Petitioner] admitted that he was "over there," although he insisted that he "never got out of the car." He stated, "I picked 'em up. I dropped 'em off." The [Petitioner] told law enforcement that he was in the car behind the apartment the entire time, heard gunshots, and saw Mr. Butler and Mr. Simpson come around a corner. Mr. Butler was delayed because he had been looking for a lost shoe. According to the [Petitioner], Mr. Simpson was armed with a .38 revolver, and Mr. Butler was armed with a .45 Hi-Point.

The [Petitioner] stated at first that he could not see from where he was sitting. However, he eventually described the conflict, noting that after Mr. Butler knocked, Mr. Butler "told [the victim] lay it down." The [Petitioner] described a man coming to the victim's aid. According to the [Petitioner], Mr. Butler fired a shot in the air, and Mr. Simpson then emerged from the bushes and fired twice. The [Petitioner] stated that Mr. Butler then fired again. The house door opened and closed, and someone inside the house fired out. The [Petitioner] dropped Mr. Butler and Mr. Simpson at Mr. Butler's home and then went to his girlfriend's house. The [Petitioner] stated that he "didn't expect it to happen like that." He elaborated later that he did not know or expect that anyone would get killed. The [Petitioner] told police that they did not acquire anything in the robbery. In his statement, the [Petitioner] implied that Ms. Collier "had something to do with it."

Investigator Wenger stated that during his investigation, he spoke with Ms. Collier and discovered that she had called her uncle after the homicide. She had also made two 911 calls that did not go through. He acknowledged that one witness at the scene had seen a tan van and that the [Petitioner] also described a tan SUV. Investigator Wenger also acknowledged that both a co-defendant and a witness said that the getaway vehicle hit another car as it was leaving but that he was unable to locate damage on Ms. Angel's Maxima or any car at the scene. Investigator Wenger stated that the other officers spoke to the [Petitioner] while Investigator Wenger was out of the room and acknowledged that he did not know if the [Petitioner] was threatened. He stated that he was not lying when he told the [Petitioner] that they could place him at the scene because law enforcement had telephone records indicating that the [Petitioner] was there. Investigator Wenger acknowledged that a woman named Ariel had been in an argument that night with the victim and that her telephone records were not

investigated. Police did not locate the two weapons which fired the shots, but they found a pump shotgun at Mr. Butler's residence. Officer Narramore of the Chattanooga Police Department testified that he did not remember questioning the [Petitioner] while Investigator Wenger was out of the room. Neither he nor the federal agent threatened or coerced the [Petitioner] during the interview.

Police officers found a live round and two bullet casings at the scene. A bullet was recovered from the frame of the doorway. They also discovered a baseball cap and a size 8 shoe. They swabbed a pool of vomit or bodily fluid found beside a vehicle.

From the gold Maxima, law enforcement recovered two cellular telephones, a ski-mask type facial wrap, a turquoise blue bandana, and a pair of size 8 1/2 shoes from the trunk. Investigator Kenneth Burnette, Jr., acknowledged that he did not collect another pair of shoes in the trunk and that he did not know if the size 8 1/2 shoes were men's or women's. He stated that he also recovered guns from the home of the [Petitioner's] mother and girlfriend.

. . . .

The shoe recovered from the scene had DNA that was a mixture from at least three individuals. Dr. Laura Boos, a special agent forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified that she was able to exclude the victim, the [Petitioner], and two of the co-defendants as contributors. The test was inconclusive regarding whether Mr. Westfield or Mr. Butler were contributors to the DNA in the shoe. The [Petitioner's] DNA was recovered from the black facial wrap found in the trunk of his girlfriend's car. The blue bandana from the car had DNA that was a mixture from three individuals. The test excluded all the profiles submitted except the [Petitioner], and it was inconclusive regarding whether the [Petitioner] was a contributor.

Steve Scott, who is employed with the firearms identification unit of the TBI, testified that the victim's clothing did not have gunshot residue, which could mean that the gunshots were fired from more than four feet away or it could mean that they were fired from closer but something interfered with the residue. The bullet recovered from the victim's head was a .45 caliber bullet which exhibited [rifling] produced by guns made by Hi-Point firearms company. The bullet recovered from the doorway was also a .45

- 8 -

caliber bullet, and it was fired from the same weapon that fired the bullet that lodged in the victim's head. The bullet from the victim's arm was a .38 or .357 bullet. Agent Scott determined that the two .45 caliber casings found at the scene "had been fired in one firearm and one firearm only," which was manufactured by Hi-Point. Agent Scott testified that none of the firearms sent to him in the investigation had fired the bullets. He acknowledged that the gun which fired the bullet in the victim's arm could have been a .357 caliber weapon. He also acknowledged that a custom-made weapon which was not a Hi-Point firearm might have fired the .45 caliber bullets.

. . . .

After the close of the State's proof, the State objected to the trial court's intention to give an instruction on lost evidence with regard to the partial recording of the [Petitioner's] statement. Relying on State v. Joshua Eugene Anderson, No. E2005-02660CCA-R3-CD, 2007 WL 1958641, at *8 (Tenn. Crim. App. July 6, 2007), the trial court elected not to give the jury charge.

State v. Unjolee Tremone Moore, No. E2015-00942-CCA-R3-CD, 2016 WL 5210866, at *1-6 (Tenn. Crim. App. at Knoxville, Sept. 20, 2016), perm. app. denied, (Tenn. Jan. 18, 2017).

On direct appeal of his convictions, the Petitioner claimed, in pertinent part, that the evidence was insufficient to support his convictions as to Mr. Westfield and that he was entitled to relief under State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), because the State failed to preserve his entire statement. Id. at *7, 9. This court concluded that the evidence was sufficient. Id. at *9. Regarding his statement, this court noted that the transcript for the Appellant's motion to suppress was not in the appellate record; therefore, the trial court's denial of the motion was presumed correct. Id. at *11. Nevertheless, this court proceeded to consider the issue and determined that the trial court did not err by concluding that the Petitioner was not entitled to relief under Ferguson.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely petition for post-conviction relief, claiming that he received the ineffective assistance of counsel. The post-conviction court appointed counsel, and counsel filed an amended petition, claiming that the Petitioner received the ineffective assistance of counsel because trial counsel (1) failed to file a motion for a continuance when the State provided trial counsel with the Petitioner's audio-recorded confession just one week before trial; (2) failed to call alibi witnesses at trial; (3) failed to call witnesses who could explain why the Petitioner's DNA was on the black facial wrap found in the trunk of Ms. Angel's car; and

- 9 -

(4) failed to file a motion in limine or raise a timely objection to testimony about the firearms, ammunition, and bulletproof vest that were found in Ms. Angel's home. The amended petition also alleged that the Petitioner received the ineffective assistance of counsel because appellate counsel failed to include the transcript of the suppression hearing with the direct appeal record and failed to raise on appeal that the trial court should have granted a mistrial because a juror discussed facts outside of the case with other jurors. Finally, the amended petition alleged that newly discovered scientific evidence in the form of a letter showed that the Petitioner was actually innocent of the crimes. Specifically, a letter written by codefendant Simpson alleged that the victim was killed during a fight with Simpson "over a woman, not during a robbery."

The post-conviction court held an evidentiary hearing on August 13, 2018. At the hearing, the then thirty-two-year-old Petitioner testified that on the morning of June 28, 2010, the day of the crimes, he went to work. He left work about 6:00 p.m. and "hung" with his younger brother "for a little bit." The Petitioner left his brother's house and "hung" with Octavia Rucker, whom he described as a "lady friend." The Petitioner returned to his brother's house with Ms. Rucker. About 11:50 p.m. or midnight, the Petitioner, Ms. Rucker, and the Petitioner's brother left in Ms. Rucker's vehicle to get something to eat on Brainerd Road. After getting something to eat, the Petitioner and Ms. Rucker drove the Petitioner's brother back to the Petitioner's brother's house, and the Petitioner and Ms. Rucker went to Ms. Rucker's house on McCallie Avenue. The victim was killed about 11:30 p.m. at the British Woods Apartments on Oakwood Drive. The Petitioner said that at that time, he and Ms. Rucker were with the Petitioner's brother.

The Petitioner testified that the next morning, he left Ms. Rucker's house and went to his second job mowing grass for New England Baptist Church. The Petitioner said he used a "facial wrap" to protect his face when he mowed grass. Officers from the Chattanooga Police Department (CPD) arrested the Petitioner on July 9, 2010. They transported him to the Police Service Center on Amnicola Highway and handcuffed him to a bench in a hallway. The Petitioner said that he arrived at the Police Service Center about 2:30 p.m. and that he sat on the bench for three and one-half to four hours. During that time, a patrolman stayed with the Petitioner and told the Petitioner that the Petitioner was "a piece of [sh*t]" and "a murderer."

The Petitioner testified when Investigator Wenger arrived at the Police Service Center, Investigator Wenger began punching him and demanding that he tell the truth. Investigator Wenger "punched" the Petitioner's left eye, and the patrolman "joined in." The Petitioner said that Investigator Wenger and the patrolman were "tag teaming" and that they beat him "[o]ff and on" in the hallway for three hours. The Petitioner said that Investigator Wenger would ask him questions and then would leave him alone with the patrolman. While Investigator Wenger was gone, the Petitioner and the patrolman

- 10 -

"continued to get into it."  When Investigator Wenger returned, he would ask the Petitioner more questions and continue beating him.  The Petitioner said that the officers never took him to an interview room and that he never realized he was being "interrogated."

The Petitioner testified that at some point, Officer Narramore and another officer "came in."  Investigator Wenger and Officer Narramore began questioning the Petitioner about the victim's death.  The officers never advised the Petitioner of his rights or had him sign a waiver of rights form.  Post-conviction counsel showed the Petitioner a signed waiver of rights form, and the Petitioner denied signing the form.

The Petitioner testified that during his interrogation, Investigator Wenger claimed the Petitioner's cellular telephone records showed the Petitioner was in the area of the British Woods Apartments at the time of the crimes.  The Petitioner acknowledged that Investigator Wenger had obtained the Petitioner's cellular telephone records from Verizon.[2]  Post-conviction counsel introduced the records into evidence at the evidentiary hearing and showed them to the Petitioner.  The Petitioner stated that according to the records, he was at 2338 McCallie Avenue at 11:40 p.m. on June 28, 2010.  The Petitioner said that the distance from McCallie Avenue to the British Woods Apartments was about ten and one-half miles and that it would have taken him twenty to twenty-five minutes to drive from McCallie Avenue to the apartment complex.  Therefore, the Petitioner knew Investigator Wenger was lying when the investigator claimed the records put the Petitioner at the crime scene.

The Petitioner acknowledged that he confessed to the crimes but said that he did so because he was "tired of getting punched on," tired of being handcuffed to the bench, and wanted to go home.  The Petitioner said that his confession was audio recorded but that parts of his confession did not make sense, which indicated that the recording had been "slic[ed]."  After he gave his confession, the Petitioner was "booked" into the Hamilton County Jail.  The Petitioner's intake officer noticed his injuries and called for medical personnel.  The Petitioner identified his medical form from the jail and read from the form as follows:  "'Evaluated inmate, a laceration believed to be from CPD, right wrist to hand.  Discomfort, swelling to left eye.'"

The Petitioner testified that about one and one-half years after he was indicted for the crimes, trial counsel was appointed to represent him.  Trial counsel had never handled a murder case prior to the Petitioner's case.  The Petitioner told trial counsel about the injuries he received at the Police Service Center, but trial counsel never contacted the Hamilton County Jail and never reviewed the Petitioner's medical records.  The Petitioner also told trial counsel where he was at the time of the crimes, but trial counsel did not try

_____

[2] The record reflects that Investigator Wenger submitted an Emergency Information Request to Verizon Wireless on July 8, 2010, and that he received the records from Verizon that same day.

to obtain any evidence to prove the Petitioner's alibi. Trial counsel received funds to hire a private investigator, but the Petitioner met the investigator only one time in three years. The Petitioner told the investigator the "basic facts" of his case and gave Ms. Rucker's name to the investigator. Trial counsel never said anything to the Petitioner about the Petitioner's cellular telephone records.

The Petitioner testified that trial counsel filed a motion to suppress the Petitioner's confession and that the prosecutor gave trial counsel a "disk" containing the confession. The State made an offer for the Petitioner to plead guilty in exchange for a sentence of twenty-five years to be served at thirty percent for his testimony against his codefendants. However, the Petitioner could not testify against his codefendants because he was not at the scene of the crimes; therefore, he could not accept the State's offer. On the morning of trial, trial counsel was not prepared, so the Petitioner asked trial counsel to recuse himself from the case. Trial counsel left the Petitioner's holding cell for five or ten minutes but returned and told the Petitioner that the trial court would not allow trial counsel to "step off" the case. During the Petitioner's trial, he learned for the first time that his confession had been audio recorded and that the recording had been transcribed.

The Petitioner testified that at some point during his trial, the bailiff informed the trial court that "one of the jurors was talking with other jurors about knowing the . . . victim's sister and growing up with Mr. Westfield." The trial court dismissed the juror and instructed the remaining jurors not to discuss the case. The Petitioner asked that trial counsel request a mistrial because the Petitioner thought the jury had been "poisoned" by the dismissed juror. The State showed the jury guns owned by the Petitioner's mother; a gun and a bulletproof vest that were discovered in Ms. Angel's house in Fort Oglethorpe, Georgia; and a gun that was found in a codefendant's home. However, none of the items belonged to the Petitioner.

The Petitioner testified that after the State closed its proof, trial counsel told him that the State did not present enough evidence to convict him; therefore, trial counsel was not going to call any of the Petitioner's witnesses, including his alibi witnesses. The Petitioner wanted to testify at trial, but trial counsel advised him not to testify due to his "past." After the jury convicted the Petitioner, trial counsel told the Petitioner that trial counsel "messed up" and "wasn't prepared" for trial. Trial counsel said he would "take the fall for it" and "let the judge know." The Petitioner stated that another attorney represented him on direct appeal of his convictions and that he met with appellate counsel only one time for twenty-five to thirty minutes. The Petitioner told appellate counsel about the "juror issue," but appellate counsel did not raise the issue on appeal.

On cross-examination, the Petitioner acknowledged that his confession consisted of one "lengthy" audio recording and one "very brief" audio recording and that he gave the

- 12 -

police details about the victim's death. He said, though, that Investigator Wenger and Officer Narramore gave him the details and that he was "just piecing things together." The Petitioner knew codefendant Butler prior to the crimes because Butler cut the Petitioner's hair. The Petitioner knew codefendant Ballou "[t]hrough mutual friends." The Petitioner did not know codefendant Simpson. Before this case, the Petitioner served five years, ten months in federal custody for carjacking.

The Petitioner testified that on July 9, 2010, CPD officers arrested him in front of his parents' house for a kidnapping and an especially aggravated robbery that were unrelated to the crimes involving the victim and Mr. Westfield. The officers transported the Petitioner to the Police Service Center, and Investigator Wenger and Officer Narramore ended up questioning him about the crimes against the victim and Mr. Westfield. The charges against the Petitioner for the unrelated kidnapping and especially aggravated robbery were later dismissed. Mr. Ballou also was arrested in the unrelated case, and the Petitioner did not know if Mr. Ballou pled guilty in that case.

The Petitioner testified that on the night of the crimes, he was with Ms. Rucker, who drove a 2000 Ford Explorer. When the Petitioner was arrested on July 9, he was with Ms. Angel, who owned a purple Nissan Maxima. Ms. Angel gave a statement to the police in which she claimed that on the night of the crimes, the Petitioner dropped her off at night school, left in her Maxima, and returned at 4:30 p.m. the next day. The Petitioner said Ms. Angel's statement was not true. He denied being in a relationship with Ms. Angel and said he was "just sleeping" with her. He said he used her car "maybe three times, and that was during the day." The police later searched Ms. Angel's house in Fort Oglethorpe and found a firearm and a bulletproof vest. The items belonged to Ms. Angel's brother, not the Petitioner. The Petitioner said he was not with Ms. Angel or driving her Maxima on the night of the crimes.

The Petitioner testified that trial counsel talked with Ms. Rucker, the Petitioner's mother, and a local pastor before trial. The Petitioner told trial counsel about the Petitioner's brother being an alibi, but the Petitioner did not know whether trial counsel spoke with his brother. The Petitioner said that during his interrogation, he was handcuffed to the bench in the Police Service Center hallway from 2:30 p.m. to 3:00 a.m. The police only allowed him to leave the bench to go to the bathroom, and they did not give him any food or water. Investigator Wenger and the patrolman were the only officers who beat the Petitioner, and they beat him "off and on" for three hours. The Petitioner said he was photographed during his booking at the jail. At that point, the State showed nine photographs to the Petitioner, and he identified them as photographs taken of him at the Police Service Center. He said he thought the photographs were taken before his interrogation. The State asked, "Detective Burnett says he took the pictures at 4:45 a.m. July 10th, is that not true?" The Petitioner answered, "I don't remember that." The State

asked the Petitioner to identify his injuries in the photographs, but the Petitioner was unable to do so. The Petitioner denied writing anything on his jail medical form.

The Petitioner testified that trial counsel filed a motion to suppress his confession and that he told trial counsel he did not sign a waiver of rights form. At the suppression hearing, Investigator Wenger testified that the Petitioner waived his rights and signed the form. The Petitioner also testified at the hearing but did not mention being beaten because he only answered the questions that were presented to him. The Petitioner said that although he admitted to planning the robbery of the victim, he did so because "the detectives told [him what] to say."

The Petitioner testified that he had prior convictions of carjacking and theft of a vehicle. The Petitioner wanted to testify at trial, but trial counsel did not want the jury to learn about his criminal history. The Petitioner disagreed with trial counsel and thought he needed to testify. The trial court held a <u>Momon</u> hearing, and the Petitioner told the trial court that he did not want to testify.

On redirect-examination, post-conviction counsel showed a photograph to the Petitioner. The Petitioner identified the photograph as his "booking picture" and said it showed a "dark bruise" under his left eye. The Petitioner acknowledged that bruises did not always show up clearly on African-Americans. He said that he told trial counsel the officers had beaten him and that he had "no idea" why trial counsel did not raise the issue at the suppression hearing. Upon being questioned by the post-conviction court, the Petitioner acknowledged that he was handcuffed to the bench in a "narrow hallway" of the Police Service Center from 2:30 p.m. until 3:00 a.m. The police officers beat the Petitioner in the hallway. The post-conviction court asked, "[W]hile people were coming and going [in the hallway], you were being beaten?" The Petitioner responded, "No, no. When they disappeared, that's when they will come and fight with me."

Twenty-seven-year-old Jean Hudson testified that the Petitioner was his older brother.[3] On the night of June 28, 2010, Mr. Hudson was with the Petitioner. Mr. Hudson explained that the Petitioner telephoned Mr. Hudson and "ended up coming . . . to visit." They "chilled" and talked, picked up Mr. Hudson's stepdaughter, and went to get food at Sonic. Mr. Hudson said that he did not remember the exact time he was with the Petitioner but that it was "around like 11 something." The Petitioner and Mr. Hudson "parted ways after a couple of hours or so." Mr. Hudson estimated that it would have taken twenty to twenty-five minutes to drive from McCallie Avenue to the British Woods Apartments.

---

[3] We note that Mr. Hudson is referred to as "John Hudson" throughout the record. However, at the outset of his testimony, he spelled his first name "J-E-A-N."

- 14 -

On cross-examination, Mr. Hudson testified that on June 28, 2010, he was living on 12th Avenue. The Petitioner telephoned him about 10:00 p.m. and again after 11:00 p.m. The Petitioner came to Mr. Hudson's house and had a "female friend" with him. The Petitioner and the woman were driving an SUV. Mr. Hudson never talked with trial counsel about the Petitioner's case. The State asked Mr. Hudson when he realized that the Petitioner had been with him at the time of the crimes. Mr. Hudson answered, "Just now, because I didn't know the time of the murder." On redirect-examination, Mr. Hudson testified that he did not come forward with his information earlier because he did not know what time the crimes occurred.

Annette Thompson, the Petitioner's mother, testified that on the night of June 28, 2010, the Petitioner came to her house and took a shower because he "was going to spend some time with a young lady." The next morning, the Petitioner returned to Ms. Thompson's house to take a shower and get his tools so that he could mow the grass at New England Baptist Church. Ms. Thompson said that the Petitioner always wore a black mask when he mowed grass because he had asthma and because he did not want to get grass on his face. Ms. Thompson spoke with trial counsel one time and had an eight-minute telephone conversation with trial counsel's investigator. Trial counsel subpoenaed Ms. Thompson to trial but did not call her to testify. Post-conviction counsel asked if the Petitioner had any "problems," such as learning disabilities, and Ms. Thompson said that he had "several diagnoses." Ms. Thompson said it would have taken a person more than fifteen minutes to get from McCallie Avenue to the British Woods Apartments. On cross-examination, Ms. Thompson said that the Petitioner left her house sometime before midnight on June 28, 2010, and that she did not see him again until 7:30 a.m. the next day.

Investigator Kenneth Burnett testified for the State that on July 10, 2010, he "process[ed]" the Petitioner at the Police Service Center and photographed the Petitioner's face and hands. Investigator Burnett took the photographs at 4:40 a.m. On cross-examination, Investigator Burnett testified that he did not know when the Petitioner was arrested or interrogated but that it could take a bruise "a day or two, could take an hour or two" to be visible on a person.

Trial counsel testified that he was licensed to practice law in 2008 and practiced criminal defense. On December 3, 2010, the trial court appointed trial counsel to represent the Petitioner. Trial counsel said that he did not represent the Petitioner at the Petitioner's preliminary hearing but that he would have reviewed the hearing transcript before trial. Trial counsel filed several motions, including a motion to suppress the Petitioner's confession. At that time, trial counsel did not have a copy of the Petitioner's audio-recorded confession. Trial counsel said he did not think he ever received a transcript of the confession. Nevertheless, trial counsel "could tell from the written discovery that there were problems with Detective Wenger's recorder." Therefore, trial counsel filed the

motion to suppress the confession pursuant to the "Ferguson theory." The Petitioner told trial counsel that he had been handcuffed to a bench for "a long time" before being questioned and that he did not sign a waiver of rights form. The Petitioner did not tell trial counsel before or during the suppression hearing that he had been beaten. The trial court denied the motion to suppress.

Trial counsel testified that he received discovery but that he did not receive a copy of the Petitioner's audio-recorded confession until one to three weeks before trial. Trial counsel reviewed the recording and tried to review it with the Petitioner in jail. However, the Petitioner did not want to review the recording "because he said he remembered what he said." On June 17, 2013, the day before trial, trial counsel filed a motion to reopen the suppression hearing proof and continue the trial, but the trial court denied the motion.

The State showed trial counsel a copy of the motion to reopen and continue the trial. Trial counsel acknowledged that according to the motion he prepared, he received the Petitioner's audio-recorded confession on April 8, 2013, which was a couple of months before trial.

Trial counsel testified that prior to trial, he notified the State about the following defense witnesses: a handwriting expert; a local church pastor; and Ms. Rucker. The handwriting expert had analyzed a note written by codefendant Simpson and had analyzed the signature on the Petitioner's waiver of rights form. Trial counsel filed a notice of alibi with regard to the church pastor and Ms. Rucker, but the Petitioner did not tell trial counsel about Mr. Hudson. Trial counsel met with the church pastor before trial. The pastor could have testified that the Petitioner mowed the grass at New England Baptist Church and used a facial wrap, but the pastor did not "feel comfortable" testifying that the Petitioner mowed the grass at the church on the morning after the crimes. Trial counsel also spoke with Ms. Rucker before trial, and she was "on standby" to testify that the Petitioner was at her home on the night of the crimes. However, Ms. Rucker had some prior theft convictions, and trial counsel "did not have a good feeling about calling her as a witness." Trial counsel ended up not calling any of the witnesses to testify. Trial counsel and the Petitioner discussed whether the Petitioner should testify, but trial counsel thought it was going to be "very tough" for the Petitioner to explain his confession. The Petitioner decided not to testify.

Trial counsel testified that three to six months before trial, he arranged for another attorney to assist him with the Petitioner's case because she had more trial experience than trial counsel. Co-counsel reviewed discovery and met with the Petitioner. During the Petitioner's trial, trial counsel overheard the Petitioner tell co-counsel that police officers had beaten him. Trial counsel explained, "When [the State] played the statements that he

- 16 -

gave to Wenger. I believe when there were gaps in the recording, he said that that was when they were beating him."

On cross-examination, trial counsel testified that after he was appointed to the Petitioner's case, he met with the Petitioner in jail. Although the Petitioner's case was trial counsel's first murder case, he did not think he mentioned that fact to the Petitioner. Trial counsel acknowledged that he did not ask the Petitioner if the police had beaten the Petitioner but said that "I would think . . . that would have probably been something he would have wanted to tell me." During the Petitioner's interrogation, Investigator Wenger claimed he could put the Petitioner at the scene of the crimes. Trial counsel cross-examined Investigator Wenger about that claim at trial and suggested that Investigator Wenger was "bluffing." Investigator Wenger then testified that he had cellular telephone records to show the Petitioner was at the crime scene and that the records were in the "master case file."

Trial counsel testified that he had received the master case file in discovery but that he did not think he ever saw cellular telephone records. At that point, post-conviction counsel showed the cellular telephone records to trial counsel, and trial counsel reviewed them briefly. Trial counsel said that according to handwritten notes with the records, the Petitioner was at 2338 McCallie Avenue at 11:40 p.m. on June 28, 2010. Trial counsel acknowledged that at trial, Mr. Westfield testified that the knock on the victim's door may have occurred at "11:30 or so." Trial counsel said it would have been "very difficult" for the Petitioner to have traveled from the crime scene to McCallie Avenue in ten minutes. Trial counsel stated that in hindsight, the telephone records "would have been very helpful" to contradict Investigator Wenger's testimony that the Petitioner was at the crime scene.

Trial counsel testified that during the trial, the jury heard statements about guns and a bulletproof vest. Trial counsel made a motion to redact the statements, and the trial court granted the motion. Trial counsel said that he should have filed the motion before trial so that the jury would not have heard about the prejudicial evidence. Trial counsel said that he also should have filed the motion to continue the trial earlier and that the motion was his "last-ditch" effort for more time to prepare for trial.

Trial counsel testified that he decided not to call the handwriting expert as a witness at trial because the expert either did not have enough information to analyze the signature on the waiver of rights form or the expert was not going to provide a "good" report. Trial counsel acknowledged that even though Reverend Ballard did not want to testify as an alibi witness, Reverend Ballard could have verified the Petitioner's use of the facial wrap. Trial counsel said he did not remember the Petitioner's mother being able to provide any information helpful to the defense. He acknowledged, though, that she could have testified that the Petitioner used the facial wrap when the Petitioner mowed grass. Trial counsel

said that he and the Petitioner were "both unhappy" with the jury's verdicts and that he probably said something to the Petitioner after the verdicts about being an inexperienced attorney. On redirect-examination, trial counsel clarified that he thought the addresses on the Petitioner's cellular telephone records were the locations for cellular telephone towers, not the locations for the Petitioner's telephone.

On September 24, 2018, the post-conviction court entered an order finding that the Petitioner was not entitled to relief on any of the issues raised in the petition or at the evidentiary hearing. Regarding the Petitioner's claim that trial counsel was ineffective because trial counsel failed to use the Petitioner's cellular telephone records at trial, the post-conviction court noted that the Petitioner did not have an expert witness testify about the records at the evidentiary hearing and found that the records did not establish the Petitioner was not at the crime scene. Thus, the post-conviction court found that the Petitioner failed to demonstrate that he was prejudiced by trial counsel's failure to use the records.

On October 11, 2018, the Petitioner filed a "motion to reconsider," requesting that he be allowed to present expert testimony about his cellular telephone records. In support of his motion, the Petitioner attached an affidavit from Glen Buckley, which was dated October 10, 2018. In the affidavit, Mr. Buckley stated that he was a licensed private investigator and a forensic examiner certified by Cellebrite, an electronic mobile device forensics company. He stated that at post-conviction counsel's request, he had reviewed "Call Detail Records and maps" prepared by the State in the Petitioner's case. Mr. Buckley concluded that the Petitioner's cellular telephone records created reasonable doubt that the Petitioner was at the crime scene.

On October 15, 2018, the post-conviction court entered an order granting the Petitioner's motion. In the order, the post-conviction court found that the court still had jurisdiction to amend its September 21, 2018 order denying post-conviction relief. The post-conviction court vacated its September 21 order and directed that the post-conviction evidentiary hearing be "reopened" for additional proof.

The post-conviction court held a second post-conviction evidentiary hearing on May 18, 2019. During the hearing, Mr. Buckley gave expert testimony that he had reviewed the cellular telephone records that were introduced into evidence at the first hearing. He also reviewed a map that showed the crime scene and various cellular telephone towers that communicated with the Petitioner's telephone on the night of the crimes. The map had been prepared by the State's expert using CellHawk software. The Petitioner's records did not include the latitude and longitude for his cellular telephone, so Mr. Buckley could not determine the location of the telephone at the time of a particular call. Instead, he could only use the records to determine the location of the cellular telephone towers that

- 18 -

communicated with the telephone. The records were consistent with the map prepared by the State's expert.

Mr. Buckley testified that at 11:30 p.m. on June 28, 2010, the Petitioner's telephone was about five and one-half miles from the crime scene. At 12:08 a.m. on June 29, 2010, the Petitioner's telephone was "just underneath and to the right" of the crime scene on the State's map.

On cross-examination, Mr. Buckley testified that he did not know the name of the service provider for the telephone records because the name was not on the records. However, evidence he received for review indicated that Cricket was the service provider; therefore, he prepared his own map showing the locations of various Cricket towers in relation to the crime scene. He said he thought a Verizon device could communicate with Cricket towers.

The State showed Mr. Buckley a police incident report.[4] According to the report, police officers were dispatched to the British Woods Apartments at 12:03 a.m. on June 29, 2010. Mr. Buckley said that at 12:08 a.m., the Petitioner's cellular telephone communicated with tower 987 on the State's map. The tower was just one and one-half miles from the apartment complex.

Mark Hamilton testified as an expert for the State that he worked in technical forensics for the CPD. Mr. Hamilton reviewed the Petitioner's cellular telephone records and used CellHawk software to prepare the map that was provided to Mr. Buckley. Although "Verizon" was not printed on the records, the records were "easily discernable" as Verizon records. He said a Verizon device could not communicate with a Cricket tower.

Mr. Hamilton testified that the Petitioner's cellular telephone records were consistent with the Petitioner's traveling toward the crime scene at 11:40 p.m. on June 28, 2010. The police were dispatched to the crime scene at 12:03 a.m. on June 29. At 12:08 a.m., the Petitioner's telephone connected with Verizon tower 987, which was consistent with someone leaving the crime scene. Mr. Hamilton stated that although the Petitioner claimed the Petitioner was with Mr. Hudson on 12th Avenue between 11:10 a.m. and 1:10 a.m., that claim was not consistent with the records. The Petitioner's claim that he went to get food on Brainerd Road during that time also was not consistent with the records.

On cross-examination, Mr. Hamilton testified that the Petitioner asserted as his alibi that he was "stationary" at someone's house during the crimes. However, the Petitioner's cellular telephone records showed that his telephone was "moving all over the place." Mr.

---

[4] The State did not introduce the report into evidence.

Hamilton acknowledged that the Petitioner's telephone was not in the area of the crime scene at 11:30 p.m.

On May 21, 2019, the post-conviction court entered a second order denying post-conviction relief. Relevant to this appeal, the post-conviction court first addressed the Petitioner's claim that trial counsel was ineffective for failing to file a motion in limine regarding evidence that firearms, ammunition, and a bulletproof vest were found in Ms. Angel's home in Fort Oglethorpe. The post-conviction court noted that the State could not connect the items to the Petitioner at trial. However, the post-conviction court concluded that even if trial counsel was deficient for not objecting to the evidence before trial, the Petitioner failed to demonstrate prejudice because his confession and his details about the crimes rendered the improper evidence "inconsequential." As to the Petitioner's claim that trial counsel should have filed a motion to continue the trial earlier so that trial counsel could have reviewed the Petitioner's audio-recorded confession, the post-conviction court found that trial counsel received the recording in April 2013, "several weeks" before the Petitioner's June 2013 trial. The post-conviction court also found that before trial, trial counsel was able to challenge the State's failure to record the entire interview pursuant to Ferguson. Thus, the post-conviction court found that the Petitioner failed to demonstrate prejudice. The post-conviction court found that the Petitioner's testimony about being beaten was "too late to be credible" and that his medical form and photographs did not "confirm" any injuries. Therefore, the post-conviction court found that trial counsel was not deficient for failing to raise the issue in the motion to suppress.

As to the Petitioner's claim that trial counsel was ineffective for not calling alibi witnesses at trial, the post-conviction court noted that according to the Petitioner's notice of alibi, which was filed on May 10, 2013, the Petitioner was with Ms. Rucker at her residence on the night of the crimes. The post-conviction court accredited trial counsel's testimony that the Petitioner did not notify trial counsel about Mr. Hudson's being an alibi witness and stated, "[The Petitioner's] present alibi seems to be an attempt to be consistent with the phone records." Thus, the post-conviction court found that the Petitioner was not entitled to relief on this issue. Regarding the Petitioner's claim that trial counsel was ineffective for failing to use the Petitioner's cellular telephone records at trial to show he was not at the crime scene, the post-conviction court noted that Mr. Westfield "estimate[ed]" the time of the crimes as 11:30 p.m. but that the police were not dispatched to the scene until 12:03 a.m., which was "a more accurate indication of the time of the offense[s]." The post-conviction court concluded that although the State did not present the time of dispatch as evidence at trial, the State would have done so if trial counsel had tried to use the Petitioner's cellular telephone records. Therefore, the post-conviction court found that the Petitioner was not prejudiced by trial counsel's failure to use the cellular telephone records.

Next, the post-conviction court addressed the Petitioner's claim that trial counsel was ineffective for failing to call witnesses to testify that the Petitioner regularly wore the black facial wrap when he mowed grass. The post-conviction court found that even if the Petitioner wore the facial wrap to mow grass at the church, it was possible that a codefendant was wearing the facial wrap with a blue bandana at the time of the crimes. Therefore, the post-conviction court again found that the Petitioner failed to demonstrate prejudice.

Finally, the post-conviction court addressed the Petitioner's claims that appellate counsel was ineffective for failing to raise the juror issue on direct appeal of the Petitioner's convictions, for failing to include the suppression hearing transcript in the direct appeal record, and for failing to argue on direct appeal of his convictions that he did not receive Miranda warnings prior to his confession and that he did not sign a waiver of rights form. The post-conviction court noted that the trial court questioned and dismissed the juror at issue and that there was no proof in the post-conviction record that the dismissed juror talked with other jurors. As to the omitted transcript, the post-conviction court noted that appellate counsel argued on appeal that the State's failure to preserve the Petitioner's entire confession violated Ferguson but that the suppression hearing transcript was not necessary for this court to address the issue. Regarding the Petitioner's confession, the post-conviction court found the Petitioner not credible when he testified that he did not receive Miranda warnings and did not sign the waiver of rights form. Accordingly, the post-conviction court denied the petition for post-conviction relief.

## II. Analysis

### A. Notice of Appeal

The State argues that we should dismiss this appeal because the Petitioner's notice of appeal was untimely. The State also argues that we should not waive the timely filing requirement and that even if timely filing is waived, we should disregard the evidence presented at the second evidentiary hearing because any evidence presented after the post-conviction court entered its first order denying post-conviction relief is not part of the record. We disagree with the State.

The post-conviction court entered it first order denying post-conviction relief on September 24, 2018. On October 11, 2018, the Petitioner filed a "motion to reconsider." On October 15, 2018, the post-conviction court entered an order granting the Petitioner's motion. In the order, the post-conviction court vacated its September 24 order and "reopened" the Petitioner's post-conviction evidentiary hearing. The post-conviction court held a second evidentiary hearing on May 8, 2019, and entered a second order denying

post-conviction relief on May 21, 2019. The Petitioner filed his notice of appeal on June 17, 2019.

The State argues that the Petitioner's notice of appeal was untimely because the post-conviction court lost jurisdiction over the Petitioner's case when the court entered its first order denying post-conviction relief on September 24, 2018. In support of its argument, the State relies on Michael Joe Boyd v. State, No. W1999-01981-CCA-R3-PC, 1999 WL 33261797 (Tenn. Crim. App. at Jackson, Dec. 21, 1999). The Petitioner responds that his motion to reconsider was actually a motion to reopen pursuant to Tennessee Code Annotated section 40-30-117(a)(2), which provides that a petitioner may file a petition to reopen a post-conviction proceeding if "[t]he claim in the motion is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted."

In Michael Joe Boyd, the post-conviction court entered an order denying post-conviction relief on February 12, 1990, and the petitioner filed a motion to reconsider thirty days later on March 14, 1990. No. W1999-01981-CCA-R3-PC, 1999 WL 33261797, at *1. A panel of this court held that the post-conviction court lost jurisdiction over the petitioner's case on February 12, 1990, the date the post-conviction court entered its order denying post-conviction relief. Id. at *5-6. The panel based its holding on Tennessee Code Annotated section 40-30-116, which provides that "[t]he order granting or denying relief [in a post-conviction proceeding] shall be deemed a final judgment and an appeal may be taken to the court of criminal appeals in the manner prescribed by the Tennessee Rules of Appellate Procedure."[5] (Emphasis added.)

Based on Tennessee Code Annotated section 40-30-116 and this court's holding in Michael Joe Boyd, the State urges this court to hold that the post-conviction court lost jurisdiction in the instant case on September 24, 2018, the day the post-conviction court entered its first order denying relief, and, therefore, that "[e]verything after [that date] was a nullity." However, in our view, the State and the panel in Michael Joe Boyd misconstrued the meaning of "final judgment" in the statute.

Rule 3(b) of the Tennessee Rules of Appellate Procedure provides that a criminal defendant may appeal to this court following "a final judgment in a . . . post-conviction proceeding." Rule 4(a) of the Tennessee Rules of Appellate Procedure instructs that "the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the entry of the judgment appealed from; however, in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document

---

[5] The post-conviction petition in Michael Joe Boyd was filed in 1988 and, therefore, was governed by the pre-1995 Post-Conviction Procedure Act. At that time, Tennessee Code Annotated section 40-30-116 was codified at Tennessee Code Annotated section 40-30-122 (repealed 1995).

may be waived in the interest of justice." Tennessee Rule of Appellate Procedure 4(c) provides that in most instances, the only way a defendant can extend the trial court's jurisdiction is to file a timely motion for judgment of acquittal, suspended sentence, withdrawal of guilty plea, new trial, or arrest of judgment.

"Most cases interpreting what is meant by the term 'final judgment' arise in the context of a Rule 3 appeal. In Tennessee, a judgment is final 'when it decides and disposes of the whole merits of the case leaving nothing for the further judgment of the court.'" Richardson v. Tennessee Brd. of Dentistry, 913 S.W.2d 446, 460 (Tenn. 1995) (quoting Saunders v. Metropolitan Gov't of Nashville & Davidson County, 383 S.W.2d 28, 31 (1964)) (internal citation omitted). As this court has explained, though,

> As a general rule, a trial court's judgment becomes final thirty days after its entry unless a timely notice of appeal or a specified post-trial motion is filed. Tenn. R. App. P. 4(a) and (c); State v. Moore, 814 S.W.2d 381, 382 (Tenn. Crim. App.). The jurisdiction of the Court of Criminal Appeals attaches upon the filing of the notice of appeal and, therefore, the trial court loses jurisdiction. State v. Peak, 823 S.W.2d 228, 229 (Tenn. Crim. App. 1991); compare Spence v. Allstate Ins. Co., 883 S.W.2d 586, 596 (Tenn. 1994). Once the trial court loses jurisdiction, it generally has no power to amend its judgment. Moore, 814 S.W.2d at 382. Indeed, it is well-settled that a judgment beyond the jurisdiction of a court is void. Brown v. Brown, 198 Tenn. 600, 281 S.W.2d 492, 497 (1955).

State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996).

This court has repeatedly stated that a post-conviction court's order granting or denying relief does not become final until thirty days after it is entered. John Ivory v. State, No. W2015-00636-CCA-R3-PC, 2015 WL 6873474, at *3 (Tenn. Crim. App. at Jackson, Nov. 9, 2015) (order denying post-conviction relief entered on February 19, 2015, became final on March 23, 2015); State v. Douglas Marshall Mathis, No. M2019-00279-CCA-R3-CO, 2019 WL 6175111, at *4 (Tenn. Crim. App. at Nashville, Nov. 20, 2019) (citing Tenn. Code Ann. § 40-30-116 and Tenn. R. App. P. 4(a), (c) and holding that post-conviction court's order became final thirty days after it was entered), perm. app. denied, (Tenn. Mar. 26, 2020); Tony Sheffa v. State, No. W2007-01443-CCA-R3-PC, 2008 WL 2687704, at *3 (Tenn. Crim. App. at Jackson, July 2, 2008) (post-conviction court's judgment became final thirty days after order dismissing petition was filed); Joseph Matthew Maka v. State, No. W2003-01209-CCA-R3-PC, 2004 WL 2290493, at *2 (Tenn. Crim. App. at Jackson, Oct. 11, 2004) (citing Tenn. Code Ann. § 40-30-116 and stating, "The conclusion, therefore, is inescapable that the post-conviction court in this case lost jurisdiction over the proceeding 30 days after it entered the order granting post-conviction relief."). Moreover,

- 23 -

Tennessee Code Annotated section 40-30-117 specifically provides that a petitioner may file a motion to reopen a post-conviction petition under certain circumstances.

Here, the post-conviction court entered its first order denying post-conviction relief on September 24, 2018. The Petitioner did not file a notice of appeal or a specified post-trial motion within thirty days. Instead, he filed a "motion to reconsider" on October 11, 2018, which the post-conviction court treated as a motion to reopen. Neither a motion to reconsider nor a motion to reopen is one of the specified motions in Tennessee Rule of Appellate Procedure 4(c). Accordingly, the post-conviction court maintained jurisdiction over the case for thirty days after entry of its first order denying post-conviction relief, and the court had not lost jurisdiction when the Petitioner filed his motion on October 11. Likewise, the post-conviction court had not lost jurisdiction when the court granted the Petitioner's motion four days later and vacated its first order denying relief. The post-conviction court filed its second order denying relief on May 21, 2019, and the Petitioner filed his notice of appeal less than thirty days later on June 17, 2019. Thus, the Petitioner's notice of appeal was not untimely.

## B. Ineffective Assistance of Counsel

The Petitioner claims that the post-conviction court erred by denying his petition for post-conviction relief. To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was

deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

1. Motion to Continue

The Petitioner claims that he received the ineffective assistance of counsel because trial counsel failed to file a motion for a continuance "the moment it [became] clear" that trial counsel was not prepared for trial. The Petitioner contends that if trial counsel had filed the motion earlier, rather than the day before trial, trial counsel could have investigated why the audio recording of the Petitioner's confession was incomplete and would have learned that the police had assaulted him during his interrogation. In support of his claim, the Petitioner asserts that his medical records and booking photograph "clearly" show that his left eye was swollen.

During the initial evidentiary hearing, trial counsel testified that the Petitioner never told him before or during the suppression hearing that the police had beaten the Petitioner at the Police Service Center. Moreover, the evidence established that trial counsel received the Petitioner's audio-recorded confession more than two months before trial. In any event, the post-conviction court found that the Petitioner's testimony about being beaten was not credible and that his medical form and photographs did not "confirm" any injuries. We have reviewed the medical form and the photographs. Although most of the handwriting on the medical form was indecipherable and the Petitioner denied writing on the form, the following was written neatly on the right side of the document: "Eval inmate & altercation believe[d] to be from CPD! Right wrist to hand discomfort. Swelling to left eye!" The photographs taken by Officer Burnett after the Petitioner's interrogation, though, did not show any injuries. While the Petitioner's booking photograph showed a dark area below

- 25 -

his left eye, his eye was not bruised or swollen. Therefore, we conclude that the post-conviction court did not err by denying relief on this issue.

The Petitioner also contends that trial counsel's filing a "timely" motion for a continuance would have allowed trial counsel to investigate Investigator Wenger's claim that the Petitioner's cellular telephone records put the Petitioner at the scene of the crimes. The Petitioner asserts that had trial counsel reviewed the records, trial counsel would have discovered that the records were "simply incompatible" with the State's theory of the case.

We have reviewed the trial transcript. Mr. Westfield testified that he had "no idea" what time he and the victim heard the knock on the victim's door but estimated that they heard the knock "[m]aybe 11:30 or so." Investigator Wenger testified that the crimes occurred "just before" or "just after" midnight and acknowledged that the police department received three 911 calls at 12:03 a.m. from witnesses who heard gunshots. Therefore, the evidence does not preponderate against the post-conviction court's finding that the crimes more likely occurred closer to 12:03 a.m. than 11:30 p.m. The evidence at the second evidentiary hearing established that the Petitioner's cellular telephone was just one and one-half miles from the crime scene at 12:08 a.m., and Mr. Hamilton testified that the location of the Petitioner's telephone at 12:08 a.m. was consistent with someone leaving the British Woods Apartments. Accordingly, we agree with the post-conviction court's conclusion that trial counsel's failure to review the records did not change the outcome of trial.

The Petitioner claims that additional time afforded by a timely motion to continue also would have allowed trial counsel to inquire into the Petitioner's mental health at the time of his interrogation so that trial counsel could have challenged whether the confession was knowing and voluntary. In support of his argument, the Petitioner notes that in the motion to reopen the suppression hearing proof and continue the trial, trial counsel stated that he was unable to present mental health information at the suppression hearing and requested a mental evaluation for the Petitioner to determine whether the Petitioner's confession was the result of police coercion. However, although the Petitioner's mother testified at the post-conviction hearing that the Petitioner suffered from "several diagnoses," the Petitioner did not present any evidence regarding his mental health at the evidentiary hearing. Furthermore, although the Petitioner claimed at the evidentiary hearing that he confessed to the crimes because he was tired of being handcuffed to the bench, tired of being beaten, and wanted to go home, he did not make that claim at the suppression hearing. Instead, he testified at the suppression hearing that the trial court should suppress his statement because he did not receive Miranda warnings prior to his interrogation, because he did not sign the waiver of rights form, and because he asked for an attorney "right off the bat." Therefore, the Petitioner is not entitled to relief on this issue.

- 26 -

## 2. Black Facial Wrap

The Petitioner claims that he received the ineffective assistance of counsel because trial counsel failed to call witnesses to testify that the Petitioner regularly wore a black facial wrap to mow grass at the church. He contends that he was prejudiced by trial counsel's failure to present the testimony because the State's theory was that he used the black facial wrap and a blue mask to cover his face during the crimes; therefore, the testimony would have explained why his DNA was on the wrap and why the wrap was in Ms. Angel's car. We note that the church pastor did not testify at the evidentiary hearing. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (providing that this court may not speculate as to the content of a witness's testimony). Ms. Thompson testified at the hearing that the Petitioner regularly wore the wrap to mow grass, and trial counsel stated that Ms. Thompson could have testified to that fact at trial. The post-conviction court found, though, that the Petitioner was not prejudiced by trial counsel's failure to present her testimony because a codefendant could have been wearing the black facial wrap with the blue bandana at the time of the crimes. We agree with the post-conviction court. Mr. Westfield testified at trial that one of his assailants was wearing a half-mask; that he saw two colors, black and teal blue; and that the blue color was either on the assailant's "doo rag" or on the assailant's mask. A teal blue bandana was found with the black facial wrap in Ms. Angel's car. The Appellant told law enforcement that he waited in the car during the attempted robbery. Therefore, the Petitioner has failed to demonstrate that he was prejudiced by trial counsel's not presenting Ms. Thompson's testimony at trial.

## 3. Alibi Witnesses

The Petitioner claims that he received the ineffective assistance of counsel because trial counsel failed to present testimony from Mr. Hudson and Mr. Buckley to establish an alibi for the Petitioner. Trial counsel testified that the Petitioner never told him about Mr. Hudson, and the post-conviction court found the Petitioner's alibi evidence not credible, stating that "[the Petitioner's] present alibi seems to be an attempt to be consistent with the phone records." Additionally, as we have already discussed, the Petitioner's cellular telephone records did not establish that the Petitioner was not at the crime scene. Therefore, the Petitioner also has failed to demonstrate that trial counsel was ineffective for not presenting testimony from Mr. Hudson and Mr. Buckley at trial.

## 4. Firearm, Ammunition, and Bulletproof Vest

The Petitioner claims that he received the ineffective assistance of counsel because trial counsel failed to file a motion in limine to prevent the jury from hearing about a

firearm, ammunition, and a bulletproof vest that were found in Ms. Angel's home. We disagree with the Petitioner.

According to the trial transcript, Officer Burnett testified that he searched Ms. Angel's Fort Oglethorpe home and photographed and collected a bulletproof vest, a pistol, and two pistol magazines. The State introduced the photographs of the items into evidence without objection. The State then moved to introduce the vest into evidence, but trial counsel objected, arguing that the items were irrelevant because the State could not "link" them to the Petitioner. Trial counsel also requested that the trial court exclude the photographs. The State asserted that the items were relevant to show the police conducted a complete investigation, which trial counsel had attacked in his opening statement. The trial court allowed the photographs to remain in evidence because trial counsel had failed to object to them. Regarding the bulletproof vest, the trial court allowed the State to introduce the vest for identification purposes only and instructed the jurors that they could not consider the vest as evidence.

The State asserts that trial counsel was not deficient because he objected and was "successful." However, trial counsel's objection to the evidence was too late to prevent the jury from hearing about the items and was too late to prevent the photographs of the items from being introduced into evidence. Therefore, we agree with the Petitioner that trial counsel was deficient. In any event, the State did not allege that the vest was related to the crimes, and the State did not attempt to introduce the pistol and magazines into evidence. Moreover, co-counsel reminded the jury during closing arguments that none of the items taken from Ms. Angel's apartment were connected to the Petitioner. Finally, given the Petitioner's confession and details about the crimes, we agree with the post-conviction court that he has failed to demonstrate prejudice. Accordingly, the Petitioner is not entitled to relief on this issue.

5. Suppression Hearing Transcript

Next, the Petitioner claims that he received the ineffective assistance of counsel because appellate counsel failed to provide this court with the suppression hearing transcript on direct appeal of his convictions, which resulted in this court's presuming that the trial court's findings on the evidence presented at the hearing were correct. We agree with the Petitioner that appellate counsel's failure to prepare an adequate record on appeal constituted deficient performance. See Rickey Lee Beamon v. State, No. E2008-01138-CCA-R3-PC, 2009 WL 2922841, at *12 (Tenn. Crim. App. at Knoxville, Sept. 14, 2009); see also Tenn. R. App. P. 24(b) (providing that it is the appellant's duty to prepare a record which conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"). As to prejudice, the Petitioner claims that

because this court presumed the trial court's findings were correct, this court was unable to consider whether Investigator Wenger deliberately destroyed the evidence.

The Petitioner contended on direct appeal that he was entitled to relief under State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), due to the State's failure to preserve his entire recorded confession. Unjolee Tremone Moore, No. E2015-00942-CCA-R3-CD, 2016 WL 5210866, at *11. Although this court found that the trial court's findings on the evidence were entitled to a presumption of correctness, this court proceeded to consider whether the Petitioner demonstrated any error. Id. at *12. As this court noted in its opinion, the trial court summarized the proof presented at the suppression hearing in the trial court's order denying the motion to suppress. Id. at *1. According to that summary, Investigator Wenger testified that the batteries failed in his tape recorder and that he replaced the batteries but that the device could no longer record when the memory became full. Id. Based on that proof, this court concluded that the Petitioner was not entitled to relief, explaining, "Although there was some evidence that the malfunction was the result of negligence, Ferguson concerns evidence which existed at one point and was subsequently lost or destroyed. In this case, the evidence was simply never in existence." Id. We have reviewed the suppression hearing transcript, and it comports with the summary of Investigator Wenger's testimony in the trial court's order denying the motion to suppress. Nothing in the transcript indicates that Investigator Wenger deliberately destroyed parts of the Petitioner's audio-recorded confession. Therefore, this court correctly determined that the Petitioner was not entitled to relief under Ferguson, and we agree with the post-conviction court that the Petitioner has failed to demonstrate that he was prejudiced by appellate counsel's deficient performance.

6. Juror Issue

Finally, the Petitioner contends that he received the ineffective assistance of counsel because appellate counsel failed to raise on direct appeal that the trial court should have declared a mistrial due to a juror discussing facts outside the case with other jurors. We disagree with the Petitioner.

The trial transcript reflects that before the State's opening statement, an officer of the court advised the trial court in a bench conference that one of the jurors had told the officer that the juror knew the victim's sister. The post-conviction court sent the jury out of the courtroom and had the officer state the issue on the record. The officer said, "Juror No. 70. . . . [She] advised me that she knew the victim's sister. . . . [T]he lady sitting in the audience." Both the State and trial counsel expressed concern about juror number 70 serving on the jury, so the trial court questioned the juror out of the presence of the other jurors. Juror number 70 stated that she thought she used to work with the victim's sister and that she did not see the victim's sister in the courtroom earlier. The trial court

dismissed juror number 70 as an alternate, and the State proceeded with its opening statement.

The Petitioner contends that the trial court should have inquired as to whether juror number 70 talked with other jurors about her relationship with the victim's family and that appellate counsel should have raised the issue on appeal. We agree that the better practice would have been for the trial court to question juror number 70 about whether she had discussed the victim's family with other jurors. Regardless, appellate counsel did not testify at the evidentiary hearing, and the Petitioner did not present any proof as to why appellate counsel did not raise the issue. Moreover, the post-conviction court found that there was no proof in the post-conviction record that juror number 70 talked with any other jurors. We agree with the post-conviction court and conclude that the Petitioner is not entitled to relief.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE